## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SHALOM GOLDSTEIN**, *et al.*, ) | |
| ) | |
| **Plaintiffs**, ) | |
| ) | |
| v. ) | **Case No. 16-cv-2507 (CRC)** |
| ) | |
| **ISLAMIC REPUBLIC OF IRAN**, *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>REPORT AND RECOMMENDATION OF SPECIAL MASTER</u>

The claims in this case arise out of injuries suffered by plaintiff Shalom Goldstein as a result of the August 19, 2003 terrorist attack on a public passenger bus in Jerusalem, Israel. Plaintiff Shalom Goldstein seeks damages for the injuries he suffered while a passenger on that bus and for the pain and suffering associated with the physical and emotional injuries incurred. Mr. Goldstein's 13 siblings and his parents each seek solatium damages for severe emotional distress caused by the injuries to Shalom Goldstein. Plaintiff Y.G., a minor, also alleges a premature birth (resulting from the shock and anxiety suffered by his mother upon learning that her son Shalom was injured in the bombing). Counts I and II of the complaint assert claims for economic damages as well as pain and suffering and solatium damages. (Count I applies only to Shalom Goldstein; Count II applies to all plaintiffs.) All plaintiffs seek punitive damages.

The Court determined that plaintiffs have established a claim or right to relief with sufficient evidence. *Goldstein v Islamic Republic of Iran*, 2018 WL 6329452 (D.D.C. Dec. 4, 2018). On December 4, 2018, the Court appointed the undersigned as special master to provide a report and recommendation on damages. (Dkt. 18). The special master appointment is governed by an Administrative Plan, which outlines the required qualifications and responsibilities of the special master. In fulfilling these responsibilities, I have reviewed all of the pleadings, the Court's

memorandum opinion, the sworn testimony provided by the plaintiffs, translated contemporaneous medical records documenting the diagnoses and treatment of Shalom Goldstein for injuries incurred in the suicide bombing, and applicable case law.  I note that the medical records for Shalom Goldstein were provided in Hebrew with certified English translation.  I have accepted the translated documents as true and accurate. My Report and Recommendation is based on the above-described information, evidence and applicable case law.

### Brief Overview

Plaintiff Shalom Goldstein was a passenger on the No. 2 Egged Bus on August 19, 2003. At approximately 9:10 pm, a passenger who had boarded the bus detonated a bomb, killing 23 and injuring 130 individuals. The details of this bombing and the resulting deaths and injuries is provided in *Cohen v. Islamic Republic of Iran*, 238 F.Supp.3d 71 (2017) (“*Cohen I*”) and *Cohen v. Islamic Republic of Iran,* 268 F.Supp.3d 19 (D.D.C. 2017) (“*Cohen II*”). Shalom Goldstein was rendered unconscious by the bombing and suffered severe lacerations, burst eardrums, an eye injury and bruises.  He also suffered from and continues to experience emotional distress, anxiety, and fear.  His siblings and parents similarly suffer from ongoing emotional effects resulting from the injuries to Shalom and the circumstances of his injuries.  One of the plaintiffs is a sibling who was born two days after the bombing – approximately 3 weeks prematurely according to an unsworn letter provided by the physician who delivered the child.

Each of the plaintiffs has provided sworn testimony about the physical and emotional injuries they and their family members have suffered and continue to suffer.  None of the plaintiffs has provided any evidence of or any computation, description or explanation of any economic loss resulting from the bombing and the injuries.

**Factual Findings**

Each of the individual plaintiffs has provided sworn testimony about his or her experience, and the effect of the bombing on their daily lives.  The testimony of each witness is consistent with the nature of the attack and the testimony of each of the other witnesses.  There is no reason to doubt the witnesses' descriptions of their own injuries and the injuries of the other members of the family.  The testimony demonstrates that the family is extremely close knit, deeply religious and that each member of the family interacts with and relies on the other members of the family on virtually a daily basis.  Shalom Goldstein has submitted contemporaneous medical records that identify the nature of the physical injuries he suffered in the attack.  There are no medical records documenting specific psychological injuries or treatment for any such injuries.  As noted, each plaintiff has provided sworn testimony outlining continued emotional distress, loss of society, fear, anxiety and stress.  I accept the witnesses' description of their physical and emotional injuries and the available medical documentation as the basis for recommending the amount of damages.  The summaries of the testimony below along with the summaries of the medical documentation constitute the factual findings upon which the recommended damages awards are based.

*Shalom Goldstein*.  Shalom was 19 years old when he was injured in the bus bombing.  The contemporaneous medical records demonstrate that Shalom suffered perforation of both the left and right eardrums, a corneal scratch on the right eye and various lacerations in the bombing.  Medical records one month after the bombing show improvement, hearing within normal limits with some remaining effects primarily in the right eardrum.  Plaintiffs' Submission of Evidence in Further Support of their Motion for Default Judgment, Declaration of Shalom Goldstein, Ex. C (Dkt. 15-1) (medical records in Hebrew, certified English translation provided to the Special Master attached as Exhibit A).

Mr. Goldstein testified that when the bomb exploded, he was sitting on the bus near the front.  Shalom Goldstein Dep., Jan. 10, 2019 (Exh. B), 9:16-17.  He recalls hearing screeching, which he believes was the sound of people dying, and he thought he was going to die.  *Id.* at 10:19-25, 11:1.  His clothes were ripped and full of soot and he was in pain.  *Id.* at 12:13-14, 17:8-15.  His ears, eye, hands and feet hurt.  *Id.* at 12:16-21.  As he made his way out of the bus he saw bodies and body parts.  *Id.* at 13:14-18.  He eventually arrived at a hospital and was reviewed for injuries.  *Id.* at 19:14-21.  His ear drums were perforated and were exuding pus.  *Id.* at 20:21-25, 21:1-8.  He recalls talking to a therapist and Rabbi Wolfson, to whom his family was close, in the hospital.  *Id.* at 23:5-11.  The therapist and the Rabbi told him it would be important to get back on a bus very soon to overcome fear.  *Id.* at 23:2-5, 16-19.  He did get on a bus at least twice after the bombing.  *Id.* at 24:3-11, 25:4-5.  On the first occasion, he gripped his brother's hand so strongly out of fear that he left nail marks.  *Id.* at 24:12-17.  On the second occasion, he became overwhelmed when the bus became crowded and he had to get off.  *Id.* at 25:4-6, 13-19.  He testified that that he still has fear and episodes that affect his daily life.  *Id.* at 44:7-10.  If he sees an accordion-type bus, similar to the one he was on when the bomb exploded, he becomes fearful.  *Id.* at 25:22-25, 26:1-6, 32:20-25, 42:20-24.  Sometimes he is unaware of his surroundings and his wife has to 'bring him back'.  *Id.* at 32:16-25, 33:1-2.  At times he experiences these episodes at work.  *Id.* at 33:5-9, 34:21-25, 35:1-4.  The fear and the reminders affect his sleep.  *Id.* at 35:17-18.  He has strong reactions on the anniversary of the bombing.  *Id.* at 45:20-23.  He has a fear of crowds.  *Id.* at 34:7-8.  He continues to speak with Rabbi Wolfson to address these issues – as needed, perhaps monthly.  *Id.* at 39:11-24.

*Rabbi Simcha Goldstein.*  Rabbi Goldstein is Shalom Goldstein's father.  Simcha Goldstein Dep., January 9, 2019 (Exh. C), 6:15-17.  Simcha testified that he learned that Shalom was in the bus that was bombed from another relative.  *Id.* at 10:13-15.  He testified that when his wife learned

of the bombing she experienced severe shock and it caused her to go into labor prematurely.  *Id.* at 12:11-20.  He testified that his family has not been the same since and that he lives with fear. *Id.* at 13:21-25, 14:1-13.  His testimony demonstrates that the family is extremely close knit and observant and that each member of the family is affected by events affecting other members of the family.  *Id.* at 8:3-7, 17:1-5.

    *Sarah B. Goldstein.*  Sarah Goldstein is Shalom Goldstein's mother.     Sarah Goldstein Dep., January 10, 2019 (Exh. D), 7:13-14.  She testified about her extreme anxiety after learning that her son was injured in the bombing.  *Id.* at 11:17-24, 12:1-4.  She testified that  to this day she feels she must have constant contact with her family.  *Id.* at 8:18-21.  She speaks with her children every day, sometimes 3 or 4 times a day.  *Id.* at 9:2-4, 9:15-17.  She needs to know that everyone is safe.  *Id.* at 9:16-17.  She learned that Shalom had been on the bus that was bombed from her husband.  *Id.* at 11:5-7.  They were not able to get in contact with anyone to find out what had happened and whether Shalom was safe.  *Id.* at 11:11-12.  She finally heard from Shalom and she described his voice as trembling and weak.  *Id.* at 12:23-25, 13:7-9.  She testified that Yechezkal (her older son who was in Israel at the time of the bombing) located Shalom in the hospital and described Shalom as very shaken up and frightened.  *Id.* at 14:13-20, 16:19-21.  She testified that when she spoke with Shalom it was clear that he was weak and hurt.  *Id.* at 19:25, 20:17-20.  A few days after the bombing Shalom went back to the hospital because his ears were hurting.  *Id.* at 21:9-12.  The day after the bombing Sarah saw a photo of the bus.  *Id.* at 23:6-9.  She could not believe that her son had survived the bombing after seeing the condition of the bus.  *Id.* at 23:10-14.  She testified that when she saw the picture she went into labor.  *Id.* at 23:24-25, 24:1-5.  She testified that normally she would not go into labor until the 10th month.  *Id.* at 23:23-24.  She testified that she has a fear of busses and will do anything to avoid going on an accordion bus.  *Id.* at 24:11-13.  She also has a fear of anyone with a backpack.  *Id.* at 24:17-18.  After the baby was

born she just kept crying.  *Id.* at 27:4-7.  She says she lives in fear and her children have picked up her fear.  *Id.* at 28:24-25, 35:9-16.  She testified that her husband also lives with fear.  *Id.* at 30:18-21.  If she gets scared she cannot sleep.  *Id.* at 34:3-7.  She relives the moments after learning of her son's injuries every time she sees something that reminds her of the bus or the bombing.  *Id.* at 28:18-23, 32:5-10, 35:3-6.  She testified that her son Y.G. who was born after the incident has developed the same fears.  *Id.* at 35:17-25.  The family discusses the incident frequently.  *Id.* at 36:7-11.

*P.G.*  P.G. is the sister of Shalom Goldstein.  P.G. Dep., January 10, 2019 (Exh. E), 6:12-15.  She was about five years old at the time of the bombing.  *Id.* at 8:13-14.  She testified that she speaks with her siblings at least once a week.  She speaks with her mother several times a day and with her father once a day.  *Id.* at 8:13-14.  She does not remember much about the day of the bombing but says that she feels that she lived through it after living with it for so long.  *Id.* at 8:17-20, 11:10-12.  She feels the tension in the house and overprotection from her mother and siblings.  *Id.* at 9:2-5, 9:19-24, 10:4-6.  She testified that she is always checking when she sees people who are unfamiliar.  *Id.* at 10:10-16.  She testified that the family speaks of the bombing quite often.  *Id.* at 11:24-25, 12:1-7, 13:3-6.  She experiences fear when she sees anything that brings back a memory of the incident.  *Id.* at 11:3-7.  She testified that the result of her family's discussion of the incident she is suspicious of anyone who looks different.  *Id.* at 13:8-14.  She continues to have this fear today.  *Id.* at 13:15-16.

*Y.G.*  Y.G. is the brother of Shalom Goldstein.  Y.G. was born two days after the bombing.  Sarah Goldstein Dep., January 10, 2019 (Exh. D), at Exh. B.  Y.G. testified that he grew up in a household filled with fear.  Y.G. Dep., January 9, 2019 (Exh. F), 9:17-20.  He testified that the fear and anxiety stemming from Shalom's injuries in the bombing permeated the home.  *Id.* at 9:17-20, 10:17-22.  He testified that he developed the same fears.  *Id.* at 8:15-22, 12:13-17.  He

relayed one example of being afraid of construction noises near their home because of the loud noises. *Id.* at 11:14-22. He expressed a fear of busses. *Id.* at 9:8-9, 10:15, 12:18-20. The complaint alleges that Y.G. was born prematurely and that the premature labor was precipitated by Sarah's anxiety and shock upon learning of the bombing. Compl. ¶¶ 16, 64 (Dkt. 1). Y.G. did not provide any testimony suggesting that he suffers any physical effects from the premature birth.

*T.G.* T.G. is currently 17 years old and was 2 years old in 2003 when the bombing occurred. T.G. Deposition, Jan. 10, 2019 (Exh. G), 7:15-18. Consistent with the testimony of the other siblings, T.G. testified that Sarah, the mother, continues to have fears resulting from the bombing and is afraid to go on busses. *Id*. at 8:7-12. T.G. learned about the bombing from other family members and is also afraid of busses. *Id*. at 9:2-9. T.G. did not testify about Shalom or his current condition.

*Shaina Kutten.* Shaina is one of Shalom's sisters. Shaina Kutten Dep., January 10, 2019) (Exh. H), 7:19. She was 23 years old in 2003 and at that time was married and living a few blocks from her parents' home. *Id.* at 8:22, 9:4-8. She testified that she was and is extremely close to Shalom. *Id.* at 9:15-16. She recalls the day they learned that Shalom was on the bus that was bombed. *Id.* at 9:22-24. In the beginning they could not get information. *Id.* at 10:1-3. They finally learned what happened. *Id.* at 11:15-17. Her mother was very emotional. *Id.* at 10:9-12. The family was frightened. *Id.* at 12:4-11. Her mother went into premature labor and her father was shaken up and fearful. *Id.* at 12:20-23, 14:24-25. She says Shalom later told her how frightened he was. *Id.* at 15:9-10. To this day she is afraid of busses, people, Muslims and whenever she is out in public she views the people she sees with suspicion. *Id.* at 15:22-25, 16:1-6. She believes her siblings and her parents are overprotective as result of Shalom's experience. *Id.* at 18:9-12, 18:24-25, 19:1-6. Her mother speaks with her 4 times a day and she speaks with her sisters 2 to 3 times a day. *Id.* at 8:2-4, 8:6-8. She stated that the injuries to Shalom affected

the entire family because they are so close. *Id.* at 20:14-21. They all have fear and anxiety. *Id.* at Shalom is less care free than he used to be before the bombing. *Id.* at 19:11-12.

*Shimon Goldstein.* Shimon is the oldest brother in the family. At the time of the attack he was newly married and in his 20s. Shimon Goldstein Dep., Jan. 9, 2019 (Exh. I), 6:13-25. He was at his in laws home when he heard of the attack. Initially he was worried because he knew that people who lived near his in laws could have been on the bus. He called his mother and learned that Shalom had been on the bus. He described his mother as "very blown away." The attack was a turning point for his entire family. *Id.* at 6:25 – 7:25. His mother went into premature labor. The family was worried that the news that Shalom had survived would turn out to be wrong. *Id.* at 8:8-21. His mother finally believed that Shalom would be okay after another brother (who was living in Israel at the time) actually saw Shalom at the hospital. *Id.* at 8:22 – 9:21. He rushed home after learning the news. *Id.* at 9:22 – 10:2. He stated that the incident damaged Shalom and that Shalom is affected when he sees things that remind him of the incident. Even the anniversary of the day of the bombing affects Shalom. *Id.* at 11:10-25. Shalom is fearful – and was not this way before the attack. *Id.* at 13:22 – 14:5. The family as a whole was terrorized by the attack and Shalom's involvement and that fear has not diminished to this day. *Id.* at 12:1 – 13:11.

*Yechezkal Shraga Goldstein.* Yechezkal is Shalom's older brother. He was 21 in 2003 when the bombing occurred. Yechezkal Shraga Goldstein Dep., January 14, 2019 (Exh. J), 8:22-23. He was living in Israel at the time. *Id.* at 9:8. The day of the bombing he was at home with his wife. He received a call from Shalom. Shalom said he had been in a terrorist attack. *Id.* at 913-19. Yechezkal did not have any information about what had happened but went to the hospital to find his brother. *Id.* at 9:21 – 10:6. When he arrived at the hospital he found people running all over. It was hard to locate Shalom among the many injured victims. *Id.* at 10:12-17. He described Shalom has having a bloody face, ripped pants, shirt and shoes. *Id.* at 11:11-16. Shalom was

shaken and frightened. *Id.* at 12:4. The hospital was conducting tests of Shalom's eyes and ears. *Id.* at 12:17-19. He tried to call his mother and had a hard time getting through. Eventually he got his mother on the phone. She wanted to hear Shalom's voice. Until she heard Shalom's voice, she was worried that the worst had happened. She thought that the truth was being hidden from her. *Id.* at 14:9 -- 15:10. Yechezkal reports that Shalom could not see out of both eyes and that he was in extreme pain and that his pillow was full of blood, either from his ears or face. *Id.* at 16:11-22. A day or so later, Shalom was in pain and the brothers attempted to go to the emergency room. (They first consulted with a Rabbi because it was Shabbat (sabbath) and they were concerned that they should not go to the hospital on that day.) *Id.* at 18:3-18. At the first hospital, Shalom was treated by an Arab doctor and he did not feel comfortable with the treatment and recommended medication. *Id.* at 21:8 – 22:17. He went to a different hospital and was much calmer. *Id. at* 23:3-12. Yechezkal reports that Shalom went to medical appointments several times and that it seemed that they were constantly back and forth to see doctors. He had several hearing tests. *Id.* at 23:17-23. Shalom had trouble sleeping. *Id.* at 24:15-22. To this day Shalom is different – he is more cautions and he is frightened of public places particularly in Israel. *Id.* at 25:20-24. His mother was very shaken by the event and went into premature labor. *Id.* at 26:15-20. Yechezkal himself is affected at times. If he sees something that triggers a memory he is fearful and describes his reaction as petrified. *Id.* at 34:11-22.

*Avrohom David Goldstein.* Avrohom is Shalom's brother. Avrohom Goldstein Dep, January 10, 2019 (Exh. K), 5:5-6. He was 17 when the bus bombing occurred. *Id.* at 9:1. He testified that the fact that his brother was injured in the bombing changed his life. *Id.* at 14:20-15. He says Shalom is "different.". *Id.* at 16:24. He says that for a time he would have to talk loudly to Shalom. *Id.* at 18:4-9. He testified that Shalom would scream at night and would dream about the bomb. *Id.* at 20:11-24. He testified that Shalom was not the same after the bombing. *Id.* at

22:12-24.  He states that he also is fearful as a result of Shalom's experience.  *Id.* at Page 23 line 5-16.  He is frightened to go on a bus.  *Id.* at 25:8-17.  He states that his brother is still affected today.  *Id.* at 26:23-25, 27:1-25.  He says that their life in general is different.  *Id.* at 35:6-10.

*Hendel Lezer.*  Hendel is Shalom's younger sister.  She was in 10th Grade at the time of the bus bombing.  Hendel Lezer Dep., January 9, 2019 (Exh. L), 6:14.  Hendel arrived home the afternoon of the bombing and found her father pacing the dining room.  *Id.* at 7:15-16.  She said that there was a sense of panic and that her father was always so calm so this was unusual.  *Id.* at 7:16-20.  She testified that growing up Shalom was 'everything' to her.  *Id.* at 9:3-4.  She felt that everything was lost after the attack.  *Id.* at 7:13-14.  She recalls the concern about the fact that no one could to Israel to be with Shalom because her mother went into labor and her father had to stay with her.  *Id.* at 11:17-24.  She testified that before this incident she had lived a sheltered secure home.  *Id.* at 7:5-7, 12:15.  After the incident there were doubts and questions.  *Id.* at 14:5-10.  She testified that there was a great deal of emotion and that she has fears and insecurity when her children leave in the morning.  *Id.* at 15:11-15.  She prays that they will arrive back home safely.  *Id.* at *Id.* at 11:16-19.  The year after the bombing she was very insecure.  *Id.* at 18:6-12, She testified that she still has the 'fears'.  *Id.* at *Id.* at 18:13.

*Dovy Goldstein.*  Dovy is the brother of Shalom Goldstein.  He is five years younger than Shalom.  Dovy Goldstein Dep, January 9, 2019 (Exh. M), 7:24-25.  He testified that when they were growing up he and Shalom used to play and that they were very close.  *Id.* at 7:4-8.  Dovy was on a camp outing on a bus when he heard that there had been a terrorist attack in Israel.  *Id.* at 8:11-17.  He did not know at first that his brother Shalom was a victim of the attack.  *Id.* at 9:8-11.  His parents did not want to tell him about his brother.  *Id.* at 10:1-4.  He did some research and he thought his brother had been killed.  *Id.* at 11:6, 11:22-24.  He testified that he has to call his mother

every day and that his mother is obsessed with protection.  *Id.* at 15:24-25, 16:1-21.  He testified that his brother Shalom will almost never travel by bus.  *Id.* at 17:7-16.

*Chaya Chana Hoffman.*  Chaya was 12 years old at the time of the bombing.  Chaya Goldstein Dep, January 10, 2019 (Exh. N) 7:10-11.  She recalls the tension in the household when the family learned that Shalom has been injured in the bombing.  *Id.* at 10:1-2, 13:13-18.  She testified that she continues to have fears and that she won't go on a bus.  *Id.* at 15:17-20.   Loud noises scare her.  *Id.* at 16:2-13.  She says she was affected by her brother's experience.  She says her mother also has fear and that the bombing continues to affect her mother.  *Id.* at 18:2-22.  She says her father still has tension resulting from his son's involvement in the bombing.  *Id.* at 19:5-12.

*Yaakov Yosef Goldstein.*  Yaakov is a younger brother of Shalom.  He was about 10 years old at the time of the bombing.  He recalls his father being very nervous that day. Yaakov Goldstein Deposition, Jan. 9, 2019 (Exh. O), 7:1-12.  He states that throughout the time he was growing up his parents were very nervous and over protective.  *Id.* at 9:15 – 10:20.  He does not recall family life before the attack but believes that this incident had a strong effect on the family.  *Id.* at 12:6-15.

*Bas-Sheva Goldstein.*  Bas-Sheva was eight years old at the time of the bombing.  Bas-Sheva Goldstein Dep, January 9, 2019 (Exh. P), 8:3-4.  She recalls learning that her brother was on the bus that was bombed.  *Id.* at 9:4-5.  She had a fear of buses as a child.  *Id.* at 14:11-19.  That fear dissipated somewhat as she got older.  *Id.* at 15:4-8.  She testified that she has an ongoing fear of Arab people.  *Id.* at 18:3-8.

*Moishe Goldstein.*  Moishe Goldstein Moishe is the brother of Shalom.  Moishe Goldstein Dep., January 9, 2019 (Exh. Q), 6:2-4.  He described learning of the bombing and that his brother had been injured.  *Id.* at 7:9-12.  He testified that the shock has stayed with him and the fear has

stayed with him to this day.  *Id.* at 7:16-19.  He is afraid of people he sees on the streets that look suspicious or Arab or anyone different.  *Id.* at 7:23-25.  He is afraid of busses.  *Id.* at 8:2-5.  He testified that he has some memories of his brother before the bombing and that they played together.  *Id.* at 9:1-9.  He noticed a lot of change in his brother after the bombing.  *Id.* at 9:12-16. He says that they are not as calm as they used to be.  *Id.* at 9:12-16, 9:17-15, 10:21-22.  The family speaks to each other every day because of the fear.  *Id.* at 10:3-6, 10:10-12.

The testimony of all of the plaintiffs is consistent. The combined testimony establishes that the family is extremely close and that issues that affect one member of the family affects the other members of the family.  The testimony further establishes that the individual family members have all been affected by the Shalom's physical and emotional injuries and that each of the family members continues to suffer fear and anxiety as a result.  The family members describe living in and growing up in an atmosphere permeated with fear.  This fear has affected the behavior of some of the family members toward their own children.  The combined testimony establishes that each individual plaintiff suffers from ongoing and significant emotional injuries.

### Determination of Amount of Damages

In recommending an amount of damages for each plaintiff, I take into account and am guided by multiple prior decisions in this district awarding damages to victims of terrorism.  *See, e.g., Wamai v. Republic of Sudan,* 60 F. Supp. 3d 84, 91 (D.D.C. 2014), *aff'd in part, vacated in part by Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017).  While it is important to strive for consistency, the individual circumstances of each victim must be considered.  In determining an appropriate award, it is necessary to consider the nature and duration of the injury, the long-term effects (emotionally and physically), the pain associated with that injury, hospitalization and treatment, and the degree and duration of impairment.  *See Peterson v. Islamic Republic of Iran,*

515 F. Supp. 2d 25, 52 n. 26 (D.D.C. 2007) ("*Peterson II*"), *abrogation on other grounds recognized in Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 15 (D.C. Cir. 2015) (*citing Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006)).

Both medical records and the sworn testimony of the injured person and the family members are relevant and may be relied upon in determining an appropriate award. *See Bluth v Islamic Republic of Iran,* 203 F. Supp. 3d 1, 23 (D.D.C. 2016) (citing evidentiary hearing and depositions to establish award for pain and suffering plaintiff experienced during and since the attacks); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015) (citing spouse's declaration in awarding solatium damages consistent with framework of *Heiser v. Islamic Republic of Iran*, 466. F. Supp. 2d 229 (D.D.C. 2006)).

The many cases in this district have established a framework for considering damages for claims asserted under 28 U.S.C. § 1605A (the state sponsored terrorism exception to the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C.A. §§ 1330, 1602-11.  *Peterson II* adopted a "baseline" of $5 million for persons suffering injuries in terrorist attacks.  *See also Akins v. Islamic Republic of Iran*, 332 F.Supp.3d 1, 40 (D.D.C. 2018); *Davis v. Islamic Republic of Iran,* 882 F. Supp. 2d 7 (D.D.C. 2012).  In *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010), the court addressed the factors that warrant upward and downward adjustments from the baseline amount of $5 million.  In *Valore* the court explained that it will "depart upward from this baseline to $7.5 to $12 million in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead." *Id.*[1]  In general, victims

---

[1] In *Peterson II,* for example, victims with skull fractures, crush injuries and damaged ear drums received upward adjustments that resulted in damages awards ranging from $7 million to $9 million.  Victims with minor shrapnel injuries and lacerations received downward adjustments resulting in smaller amounts in the range of $2-$3 million.

with long-term injuries or long-term effects of injuries receive higher awards than victims whose injuries are temporary or promptly healed.  In *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 293, 324 (D.D.C. 2005), the court issued awards of $750,000 for temporary and minor injuries.  Courts have also applied downward adjustments where claims of permanent injury (such as permanent hearing loss) are not substantiated by medical records.  *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 45-46 (D.D.C. 2016).  For victims who suffer severe emotional injury without physical injury the courts have awarded damages in the range of $1.5 million.  *See Relvas v Islamic Republic of Iran,* 2018 WL 1092445, at *2 (D.D.C. Feb. 28, 2018) *Akins,* 332 F.Supp.3d at 40; *Valore*, 700 F. Supp. 2d at 85; *Peterson II*, 515 F. Supp. 2d at 56.  Thus, in determining the appropriate damages award, it is necessary to evaluate the injured victim's physical and emotional injuries along the spectrum of severity established in prior decisions.

Solatium damages compensate those with a close personal relationship to the victim for mental anguish and grief as well as for loss of society and comfort.  *See Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs, et al.,* 892 F.3d 348, 356-57 (D.C. Cir. 2018) ("As explained in *Flatow*, '[s]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society. … "[M]ental anguish, bereavement and grief … constitutes the preponderant element of a claim for solatium.'") (quoting *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1 (D.D.C. 1998)). Solatium damages may be awarded to relatives of an injured victim where the evidence establishes loss of society and comfort, mental anguish and grief.  *See Kaplan*, 213 F. Supp. 3d at 38.  A close relative need not be present at the attack in order to be eligible for solatium damages.  *See Cohen I,* 238 F.Supp.3d at 84 ("Solatium claims are typically brought by family members who were not present or injured themselves."); *id*. at 85 ("because of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family

14

even if they were not physically present during the attack as long as there is some evidence of that they suffered mental anguish and trauma as a result of it") (*citing Braun v. Islamic Republic of Iran*, 228 F.Supp.3d 64, 81-83 (D.D.C. 2017); *Ben–Rafael v. Islamic Republic of Iran*, 540 F.Supp.2d 39, 56 (D.D.C. 2008); *see also Republic of Sudan v. Owens*, 194 A.3d 38 (D.C. Ct. App. 2018) (answering question certified by *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), and holding that under DC law a claimant alleging emotional distress arising from a terrorist attack that killed or injured a family member need not have been present at the scene of the attack in order to state a claim for intentional infliction of emotional distress). There is a presumption that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'" *See Fritz v. Islamic Republic of Iran*, 324 F.Supp.3d 54, 62 (D.D.C. 2018) (*quoting Kaplan v. Hezbollah,* 213 F.Supp.3d 27, 38 (D.D.C. 2016).

The size of the solatium award is based on several factors. *See Fritz*, 324 F. Supp.3d at 62 ("The size of the award is based on multiple factors, including 'evidence establishing an especially close relationship between the plaintiff and decedent,' 'medical proof of severe pain, grief or suffering on behalf of the claimant,' and the particular 'circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." (quoting *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 26–27 (D.D.C. 2011)). *See also Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d at 14 (stating that "in the context of distress resulting from injury to loved ones—rather than death" baseline solatium awards are valued at half the awards to family members of the deceased," and that enhancements may be "warranted when, *inter alia,* 'evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is presented]; and circumstances

surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing.'")
(citations omitted); *see also Braun*, 228 F. Supp. 3d at 85 (explaining that because solatium
damages are "by their nature … unquantifiable, the Court has developed a commonly accepted
standardized framework, known as the *Heiser* damages framework" for damages awards, but that
the court has discretion to enhance the award based on "'evidence establishing an especially close
relationship between the plaintiff and decedent, particularly in comparison to the normal
interactions to be expected given the familial relationship; medical proof of severe pain, grief or
suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made
the suffering particularly more acute or agonizing.'") (citing *Oveissi*, 768 F.Supp.2d at 26–27).

      In situations where the victim has suffered physical (and not solely emotional) injury,
several cases have awarded solatium damages ranging from $4 million for a spouse of the victim,
$2.5 million for parents of the victim, and $1.25 million for siblings of the victim.  *See, e.g.,
Anderson v. Islamic Republic of Iran*, 839 F. Supp. 2d 263, 266 (D.D.C. 2012).  These amounts
should be viewed as a starting point for evaluation – subject to adjustment based on such factors
as the nature of the relationship between the victim and the relative and the nature of the injury to
the victim.  *Akins*, 332 F.Supp.3d at 43 ("Factors militating in favor of an award enhancement"
include "'evidence establishing an especially close relationship'") (quoting *Oveissi*, 768 F.Supp.2d
at 26–27).

      It is also important, in determining a solatium award, to consider the relationship between
the solatium awards and the award to the victim for his or her pain and suffering.  Courts have
reasonably concluded that "[I]t is inappropriate for solatium awards of family members to exceed
the pain and suffering awards of the surviving servicemen."  *Davis,* 882 F. Supp. 2d at 15-16
(*citing Bland v. Islamic Republic of Iran,* 831 F. Supp. 2d 150, 157 (D.D.C. 2011)*; O'Brien v.*

*Islamic Republic of Iran*, 853 F. Supp. 2d 44, 47 (D.D.C. 2012)); s*ee also Cohen II*, 268 F.Supp.3d at 26.

### Recommended Awards

**Damages for Physical Injury/Pain and Suffering for Shalom Goldstein.**

Shalom Goldstein is the only plaintiff who suffered a physical injury in the attack and is the only plaintiff who was present at the site of the attack.  Shalom suffered injuries to his ear drums and his right eye.  He also received lacerations and experienced significant pain as a result of the attack.  The testimony of his brother Yechezkal Shraga Goldstein describes ongoing and severe pain and multiple visits to doctors and hospitals to treat the injuries.  Although there is no medical documentation in the record of medical treatment for emotional or psychological injuries, the testimony of Shalom and his family members provides evidence of long term emotional injury that affects his ability to function in everyday life.  Shalom has testified that he continues to experience fear and anxiety and that the emotional trauma from the attack continues to affect his sleep and ability to work.  He further testified that he continues to seek therapeutic advice from the Rabbi who assisted him at the time of the attack.  Various family members testified that Shalom is fearful, and that he is different than he was before the attack. The medical evidence regarding the injuries to his ears, eye and body all date from a period shortly after the time of the attack. There is no medical evidence of any ongoing physical complications from the injuries received in the attack.  Shalom has, however, testified that he continues to experience hearing difficulties.

Based on the testimonial evidence of continued effects on his hearing and the continued emotional effects, I recommend an award of $4.25 million - slightly lower than the 'baseline'. This award is based on a determination that Shalom experienced short term physical injury but continues to experience significant emotional injury.  While Shalom experienced severe pain and diminution of hearing in the period shortly after the bombing there is no medical evidence of

ongoing physical harm.   This amount is consistent with determinations in other cases.   In particular, it is consistent with the awards in *Cohen* – for injuries incurred in the same bombing incident.   *See Cohen II,* 268 F.Supp.3d at 25 ($5 million baseline award for Ora Cohen who "suffered a broken nose, and injury to her neck, and significant damage to her eardrum," and although her "physical injuries, while significant [were] not as severe as that of other FSIA plaintiffs," the "extent of her emotional injury is unique;" $5 million baseline award for Meirav Cohen "because injuries to her ears, which are frequently infected, continue to impact her daily life" and she was "hospitalized for nine days after the attack and still bears daily reminders of it in the form of scars on her face, legs, and arms;" $3 million award for Orly Coehn who "suffered shrapnel wounds in the attack, and while she still suffers from some hearing loss, her physical injuries are less severe;" and $3 million award for Daniel Cohen, who, "like Orly, suffered from shrapnel wounds and has ongoing issues with his hearing, such as ringing in his ears.").   *See also Wamai*, 60 F. Supp. 3d at 92 (plaintiff who suffered minor physical injuries but severe hearing loss in both ears that continues and severe emotional damages awarded $3 million); *Davis*, 882 F. Supp. 2d at 12-13 (court found appropriate pain and suffering award to be $2 million where plaintiff suffered hearing loss and severe PTSD as a result of the bombing); *Wamai*, 60 F. Supp. 3d at 92 (plaintiffs received $2.5 million award who had some hearing or vision impairment and emotional damage, such as plaintiff who suffered minor lacerations and continued to suffer partial vision impairment after reparative surgery); *see also Akins,* 332 F.Supp.3d at 41 (adopting downward departure to a range of $1.5 to $3 million for victims who suffered severe emotional injury accompanied by relatively minor physical injuries such as cuts and bulging discs); *Khaliq v. Republic of Sudan*, 33 F.Supp.3d 29, 33 (D.D.C 2014); *Braun*, 228 F.Supp.3d at 84 (awarding $2.5 million for "physical and psychological injuries" where victim's physical injuries were "more akin to minor injuries from shrapnel or small-arms fire).

**Solatium Damages**.

In general, as noted, there is a presumption that family members suffer grief and emotional injury as a result of a terrorist attack on another family member.  *See Fritz*, 324 F. Supp.3d at 62; *Kaplan*, 213 F. Supp. 3d at 38 ("The guidelines emerging from prior decisions begin with the 'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish[,] … and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'") (*quoting Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 403 (D.D.C. 2015) ("Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish.   As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages.") (citations omitted).  This presumption "is a direct reaction to terrorists' acknowledged aim of causing "the highest degree of emotional distress, literally, terror.".  *See Kaplan*, 213 F. Supp. 3d at 38.

The family members have each provided consistent testimony establishing that this family is extremely close.  The family members are in frequent – essentially daily – contact and each family member exhibits concern and empathy for the well-being of the other members of the family.  (Shalom Goldstein is one of 14 children and he himself has 8 children.)  Shalom Goldstein Dep. (Exh. B), at 8:11-12.   Each of the family members is intimately familiar with the circumstances of Shalom's injuries and the emotional effects he has experienced.  The family members testified to the effect that Shalom's ongoing emotional injuries have had on the family in general.  In fact, the family members testified that they too have developed fear reactions and anxiety that stem from Shalom's experience.

Based on the testimonial evidence it is appropriate to award solatium damages to the family members.  One family member – Y.G. – was born two days after the bombing and obviously did not experience the effect on the family in the immediate aftermath of the bombing.  Many courts have declined to award solatium damages to children born after the incident.  *See Warmai v. Republic of Sudan,* 60 F. Supp.3d 84 (D.D.C. 2014) ("in similar cases courts have found that children born following terrorist attacks are not entitled to damages under the FSIA.") (citing *Davis*, 882 F.Supp.2d at 15; *Wultz v. Islamic Republic of Iran*, 864 F.Supp.2d 24, 36 (D.D.C.2012)).  The court in *Warmai explained that, "[i]*n holding that a plaintiff must have been alive at the time of an attack to recover solatium damages, the *Davis* court recognized the need to draw lines in order to avoid creating 'an expansive and indefinite scope of liability' under the FSIA—or example, liability to children born fifteen years after an attack (a real possibility in this drawn-out litigation)."  *Warmai*, 60 F.Supp.3d at 84 (citing *Davis*, 882 F.Supp.2d at 15); *see also Opati v. Republic of Sudan,* 60 F.Supp.3d 68, 80 (D.D.C. 2014) ("The Court agrees with the special masters and with the *Davis* court's interpretation of the FSIA, and holds that those plaintiffs not alive at the time of the bombings cannot recover solatium damages."); *Estate of Brown v. Islamic Republic of Iran,* 872 F.Supp.2d 37, 44 (D.D.C. 2012) ("Brian Kirkpatrick was severely injured in the Beirut bombing.  Following the Heiser framework, the special master recommended that his son, Sean Kirkpatrick, receive a $2.5 million solatium award.  … Sean was born on December 17, 1983—almost two months after the October 23 bombing.  This Court has previously held that "some lines must be drawn" and that after-born children are ineligible to receive solatium awards under FSIA.").

In this case, Y.G. was born two days after the incident and his premature birth is attributed by the testimony and the letter (albeit unsworn) from the delivery physician to the stress and shock of the bombing.  There is little difference between a child born two days after the attack and a child

who was only months old at the time of the attack.  In both situations, the child's feelings of loss of society and comfort stem from the family dynamic and the condition of the victim and his or her relationship with the child.  Here Y.G. testified that he grew up in a household permeated with fear and that he has absorbed those fears and feels as if he experienced the incident himself.  He reports that he is afraid of the same types of things that have triggered fear reactions in other family members.  *See* Y.G. Dep. 8:15-22, 12:13-17.

The courts that have declined to award damages to an afterborn child have reasoned that such line drawing is necessary to avoid a situation where damages could potentially be claimed for children born years later.  There is one distinguishing factor here:  there is evidence that Y.G. was born prematurely as a result of his mother's emotional shock and distress resulting from learning that her son Shalom had been injured in the bombing.  While there is no evidence that Y.G. suffered any specific physical effects of his premature birth, a premature birth in itself is an event that creates fear and anxiety.  It is reasonable to conclude that this child's life experience was and is affected not only by the experience of his brother that occurred before his birth but also by the circumstances of his birth.  This extraordinary situation warrants consideration and I recommend a solatium award that is half the baseline amount generally awarded to siblings.

With respect to the other siblings, the testimony and experience of the family members supports solatium awards consistent with the general "baseline" established in the case law.  The testimony and experience of the family supports a solatium award consistent with the baseline for Shalom's father.  I recommend an upward adjustment for Shalom's mother in light of her well advanced pregnancy at the time of the bombing and the fact that she gave premature birth to her youngest child within two days of the bombing.   Accordingly, I recommend solatium awards as follows:

Simcha:  $2.5 million

Sarah:  $3 million

Siblings (except for Y.G.):  $1.25 million each.

Y.G.:  $625,000.

## Prejudgment Interest

Plaintiffs' complaint requested prejudgment interest.  The court has discretion to award prejudgment interest from the date of the attack until the date of final judgment.  *Baker v. Socialist People's Libyan Arab Jamahirya,* 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court has noted that prejudgment interest on non-pecuniary damages is likely not warranted because the awards in general are designed to provide full compensation.  *Cohen II*, 268 F.Supp.3d at 27 n.2 (citations omitted).  In several cases courts have awarded prejudgment interest on non-pecuniary awards on the grounds that the plaintiff should not be penalized by losing the use of the money where the award is made years after the incident and the terrorist organization should not be rewarded by having retained the use of the money for that period of time.  *See Fritz v. Islamic Republic of Iran,* 324 F.Supp.3d 54, 63-64 (D.D.C. 2018) (concluding prejudgment interest was appropriate and would be calculated at the average annual prime rate in each year from the date of the terrorist incident).[2]

In general, it seems that the reasoning of the cases that have declined prejudgment interest is reasonable.  The recommended awards are substantial and, as many courts have concluded, fully compensatory.  However, I have provided a calculation of prejudgment interest for each plaintiff in the event that the Court determines that such an award is appropriate.  Prejudgment interest is calculated herein at the prime rate for each year between the incident and the entry of final

---

[2]  I note that the *Heiser* damages survey was compiled over 13 years ago and there is an argument that those values are no longer current.  If that assessment is appropriate, then the application of prejudgment interest would not result in overpayment.

judgment using the methodology described in *Amduso*.  *See Amduso v. Republic of Sudan*, 61 F. Supp. 3d 42, 53 (D.D.C. 2014), *aff'd in part, vacated in part by Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017).  A multiplier was calculated using the Federal Reserve's data for the average annual prime rate in each year since 2003.  *See Bd. of Governors of the Fed. Reserve Sys. Historical                        Data*,                    available                    at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15  (last  visited  March  15, 2019).  As of March 15, the Federal Reserve has not posted the annual prime rate for 2019, so, the rate applied is the current rate.  Consistent with *Amduso*, to calculate the multiplier, the Special Master multiplied $1.00 by the prime rate in 2004 (4.34%) and added that amount to $1.00, yielding $1.04.  Then, that amount was multiplied by the prime rate in 2005 (6.19%) and added that amount to $1.04, yielding $1.11.  Continuing this iterative process through 2019 yields a multiplier of 2.03.  "The product of the multiplier and the base damages amount includes both the prejudgment interest and the base damages amount; in other words, applying the multiplier calculates not the prejudgment interest but the base damages amount plus the prejudgment interest, or the total compensatory damages award."  *Id.* at 54 n.13.

**Summary of Recommendations**

| | Pain and Suffering[3] | Prejudgment Interest on Pain and Suffering | Solatium | Prejudgment Interest on Solatium | Total Without Prejudgment Interest | Total With Prejudgment Interest |
|---|---|---|---|---|---|---|
| Shalom Goldstein | $4,250,000 | $4,362,858 | $0 | $0 | $4,250,000 | $8,612,858 |
| Rabbi Simcha Goldstein | $0 | $0 | $2,500,000 | $2,566,387 | $2,500,000 | $5,066,387 |
| Sarah B. Goldstein | $0 | $0 | $3,000,000 | $3,079,665 | $3,000,000 | $6,079,665 |
| Y.G., a minor | $0 | $0 | $625,000 | $641,597 | $625,000 | $1,266,597 |
| P.G., a minor | $0 | $0 | $1,250,000 | $1,283,194 | $1,250,000 | $2,533,194 |
| T.G., a minor | $0 | $0 | $1,250,000 | $1,283,194 | $1,250,000 | $2,533,194 |
| Shaina Kutten | $0 | $0 | $1,250,000 | $1,283,194 | $1,250,000 | $2,533,194 |
| Shimon Goldstein | $0 | $0 | $1,250,000 | $1,283,194 | $1,250,000 | $2,533,194 |
| Yechezkal Shraga Goldstein | $0 | $0 | $1,250,000 | $1,283,194 | $1,250,000 | $2,533,194 |
| Avrohom David Goldstein | $0 | $0 | $1,250,000 | $1,283,194 | $1,250,000 | $2,533,194 |
| Hendel Lezer | $0 | $0 | $1,250,000 | $1,283,194 | $1,250,000 | $2,533,194 |
| Dovy Goldstein | $0 | $0 | $1,250,000 | $1,283,194 | $1,250,000 | $2,533,194 |
| Chaya Chana Hoffman | $0 | $0 | $1,250,000 | $1,283,194 | $1,250,000 | $2,533,194 |
| Yaakov Yosef Goldstein | $0 | $0 | $1,250,000 | $1,283,194 | $1,250,000 | $2,533,194 |
| Bas-Sheva Goldstein | $0 | $0 | $1,250,000 | $1,283,194 | $1,250,000 | $2,533,194 |

[3] Physical Injuries and Emotional/Psychological Distress Damages

| Moishe Goldstein | $0 | $0 | $1,250,000 | $1,283,194 | $1,250,000 | $2,533,194 |
|---|---|---|---|---|---|---|

### Punitive Damages

"The language of FSIA specifically 'provides courts with the power to award punitive damages against an agency or instrumentality of a foreign state in a case' brought pursuant to 28 U.S.C. § 1605A." *Bluth*, 203 F. Supp. 3d at 25 (*quoting Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 24 (D.D.C 2002)). Courts have adopted several approaches to the calculation of punitive damages under section 1605A of the FSIA.

This Court in *Cohen II* concluded that a multiplier of two times compensatory damages was appropriate in the case, and that the resulting punitive damages award should be apportioned among the Plaintiffs relative to their individual compensatory awards.

Immediately after the *Cohen II* decision, the United States Court of Appeals for the District of Columbia Circuit issued its decision in *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *petition for cert. filed* (Mar. 2, 2018). In Owens, the Court vacated an award of punitive damages against Sudan for its role in a 1998 terrorist attack, holding that "the FSIA terrorism exception does not retroactively authorize the imposition of punitive damages against a sovereign for conduct occurring before the passage of § 1605A" in 2008. *Owens*, 864 F.3d at 812; *see also id.* at 818 ("[A] plaintiff proceeding under either state or federal law cannot recover punitive damages for conduct occurring prior to the enactment of § 1605A."). *See also Akins,* 332 F.Supp.3d at 45 ("As in *Owens*, where the conduct at issue occurred in 1998, the 1996 Khobar Towers attack preceded the 2008 enactment of § 1605A. Accordingly, the plaintiffs are not entitled to punitive damages."); *Fritz*, 324 F.Supp.3d at 65 ("Because the Karbala attacks occurred in 2007, and because this Court is bound by *Owens*, the families of Fritz, Falter, and Chism have withdrawn their request for punitive damages. … Ahmed Al-Taie, however, was not murdered until sometime

25

between February 2009 and February 2011, well after the enactment of the 2008 NDAA. Thus, Plaintiffs may recover punitive damages for the injuries he and his family sustained after January 28, 2008.").

In light of *Owens*, I have not made a recommendation on a punitive damages award.  I note that if the *Owens* decision were to be reversed, the application of a punitive damages multiplier is a relatively simple exercise.

Respectfully submitted,

By:   /s/ Deborah E. Greenspan
      Deborah E. Greenspan, Esq.
      Special Master
      March 15, 2019